UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Cause No. 4:21CR00367SEP |
| v. | ) |
| | ) |
| EDSON ORTIZ, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S SENTENCING MEMORANDUM**

"Freak."

"Weirdo."

"Cyclops."

These are names Edson Ortiz has been called since he was a child. He has endured merciless bullying and judgment from others due to his physical appearance and medical issues. For most of his life, he has been ostracized by his peers. At age four, Edson was diagnosed with Marfan Syndrome. The problems that come along with this diagnosis are complex, numerous, and will last his entire life.

Edson's way of coping with being rejected by his peers took various forms throughout his life. He began struggling with depression when he was nine years old. He has tried taking his own life multiple times. As the real world shunned him, Edson found comfort in the world he built online – a world where his first impression was not his physical appearance. Making friends online is one of the main reasons Edson is still alive. Unfortunately, Edson got too caught up in the life he created online and made some horrible decisions because of it. He deeply regrets what he did and provides all of the following information about his life and medical condition not to excuse his conduct but to

1

give the Court a full picture of who he is and how he got to the point of being involved in a case like this.

As the Court is aware, there are multiple considerations at sentencing, but one of the most important is ensuring that the defendant receives needed medical care in the "most effective manner." 18 U.S.C. § 3553(a)(2)(D). Edson's medical condition will continue to require significant treatment, and that need will only increase. The types of treatment and the frequency with which Edson needs them are requirements the BOP cannot effectively handle. Supervised release with a term of home incarceration will ensure that Edson receives the medical care he needs.

For these reasons Edson Ortiz, through counsel, respectfully requests the Court sentence him to eight days' time served, a lengthy period of home incarceration with the ability to attend medical appointments and sex offender treatment, and lifetime supervised release with conditions.  This sentence reflects Edson's history and characteristics including his substantial medical condition, the need for punishment and deterrence, and is sufficient but not greater than necessary to serve the purposes of sentencing set forth in 18 U.S.C. §3553(a)(2).

### Edson's Life with Marfan Syndrome

At age four, Edson was diagnosed with a disorder that would change his life – Marfan Syndrome (MFS). Of course, at the time, he could not comprehend the gravity of that diagnosis, but he knew there was something that made him different from the other kids. MFS is an inherited disorder that affects connective tissue — the fibers that support and anchor your organs and other structures in your body.[1] It is a very rare disorder, and only one in every 5,000 people are diagnosed.[2] MFS most commonly affects the heart, eyes, blood vessels and skeleton, and if the aorta (the large blood vessel that carries blood from the heart to the rest of the body) is affected,

---

[1] The Marfan Foundation, accessed at https://marfan.org/conditions/marfan-syndrome/
[2] Supra note 1

the condition can become life-threatening.[3] It also causes obvious physical deformities such as spine curvature.[4] Regular monitoring to check for damage progression is vital. MFS is uniquely tragic because it is unstoppable, and the effects worsen over time. Physical deterioration and deformities cause the body to age aggressively.

However, the effects are not just physical. They lead to psychological complications as well. Supporting this conclusion is extensive research connecting MFS with increased depression, anxiety and psychosocial development issues like low self-esteem, confidence, and body image issues.[5]

For Edson, the problems started with his eyes. He began wearing thick, large eye glasses called "Aphakic Specs" and taking daily medications immediately after his diagnosis. He suffered significant physical pain in his joints and eyes. Over time, those issues resulted in Edson developing a spine curvature and dealing with drastic weight fluctuations.

Edson has had all the serious physical complications that can come with MFS. Since his diagnosis, he has attended hundreds of medical visits. He has undergone eight different eye procedures, including a total removal of his right eye and prosthetic insertion. He has had one major heart surgery, a mechanical heart valve replacement, and aortic root repair. He suffered a brain aneurysm, which is an enlargement of a blood vessel, that if it were to rupture would cause life altering changes, if not death.[6] Edson's doctors believe the aneurysm has an increased chance

---

[3] Supra, Note 1
[4] Supra, Note 1
[5] Van Tongerloo A, De Paepe A. *"Psychosocial adaptation in adolescents and young adults with Marfan syndrome: an exploratory study."* 35 JOURNAL OF MEDICAL GENETICS 405-409 (1998). doi:10.1136/jmg.35.5.405; Miklós Pólos, et al. *"Psychological factors affecting Marfan syndrome patients with or without cardiac surgery."* 9,5 ANNALS OF PALLIATIVE MEDICINE 3007-3017 (2020). doi:10.21037/apm-20-546; Hofman KJ, et al. *"Marfan Syndrome: neuropsychological aspects"* 31 AM J MED GENET 331-338 (1988).
[6] Brain Aneurysm Foundation, accessed at bafound.org/about-brain-aneurysms/brain-aneurysm-basics/

for rupture in light of Edson's other medical conditions. Additionally, Edson suffers from sleep apnea, hypertriglyceridemia,[7] migraines, and pes planovalgus feet.[8]

### Growing Up Isolated

Since Edson started going to school, he has been the subject of bullying. Edson's glasses warped the look of his eyes to others. He was very skinny and weak in stature compared to the other boys his age. In school, Edson received special accommodations because of his Marfan Syndrome. This special treatment did not help his popularity among his peers. His physical appearance and awkward demeanor garnered severe bullying. Edson was teased, harassed, and ignored every day at school. Edson was viewed as small, weak, and strange by his peers, some calling him a "monster." At one point, because of the bullying and harassment Edson endured, his entire family was forced to move to a new city.

Edson's Marfan Syndrome led to him having an incredibly different childhood experience than his peers. Edson's main place of socialization was in medical facilities. His "friends" were nurses and medical staff. Edson's "playground" was somewhere safe indoors, away from any physical activity that could cause him pain or harm. He was never able to participate in sports. For a young boy, playing with other kids and getting involved in sports is practically a requirement to making social connections. But Edson could not get involved in those activities, so he became extremely isolated. By age nine, Edson had his first symptoms of depression. By age eleven, he made his first attempt at suicide by cutting his wrists. This would not be the last time he attempted to take his own life.

---

[7] Hypertriglyceridemia occurs when one has too many triglycerides (fats) in their blood. This raises one's risk of heart disease. Rade N. Pejic and Daniel T. Lee, *Hypertriglyceridemia*, 19 THE JOURNAL OF THE AMERICAN BOARD OF FAMILY MEDICINE 3, 310-316 (May 2006).

[8] This is a foot deformity that causes severely flat and internally rotated feet which then causes knee, back, and hip issues. See Marc A. Raj; Dawood Tafti; John Kiel, *Pes Planus*, NATIONAL LIBRARY OF MEDICINE – NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION (September 2022), accessed at https://www.ncbi.nlm.nih.gov/books/NBK430802/

At 18 years old, Edson had open-heart surgery to replace his aorta with a mechanical valve. He was in so much pain following the surgeries and in such a state of despair that he attempted to jump out of the seven-story hospital window. Edson could not bear the thought of living in that much pain for the rest of his life. By the time he was 26, Edson made his third attempt at suicide. This was following the surgery to remove his right eye. After the surgery, Edson's doctors put him on blood thinners. This ended up causing a major complication where his eye area began to fill with blood underneath the stitches and became so full of pressure that Edson felt like his head was going to explode. The pain and pressure surrounding his eye was even more severe when Edson tried to lay down and sleep. For almost three months, he barely slept each night. He was in constant pain and did not know when or if it would end. This issue could not be immediately treated so he suffered for almost three months before he could have follow-up surgery. After some time, he began hallucinating because of the pain. This torturous period led Edson to try to take his own life once again by cutting his wrists.

Simply picking one of these hardships for a child to endure would be enough to create lifelong trauma. But Edson has dealt with an immense amount of pain and suffering, both physical and emotional. His life has been far from easy, and although it does not excuse his conduct, it does provide some perspective into how Edson ended up before this Court.

### Cycle of Abuse

There is no excuse for these types of offenses. Minors being sexually abused is one of the worst offenses our society recognizes.  It is easy to say that the crime is reprehensible and stiff punishment is appropriate.  However, Counsel contends the question of punishment is made harder when the defendant is also a victim of childhood sexual abuse.  Perhaps they themselves, as victims of all people, should know the harm that it causes and therefore should be the last person to commit

5

offenses against children. However, researchers in this field have found that there is an alarming correlation between the rate of abused children who become abusers themselves, particularly among adult male offenders.[9] Children who were victims of physical or sexual abuse were significantly more likely than children who were not abused to become perpetrators of sexual abuse in adulthood.[10]

This is known as a "cycle of abuse." Unfortunately, Edson was unable to remove himself from that cycle of abuse. His physical condition due to MFS also placed him in a vulnerable position. He was an easy target for not only bullying, but abuse. At age 11, Edson was sexually abused by his older cousin. She forced him to take his clothes off and touch her genitals. She furthered the trauma and humiliation by forcing Edson to rub his genitals on the family dog. Edson suffered this abuse for two years before his parents finally found out about it. That level of abuse is life-altering and requires intense therapy to overcome. In the years following, he did not receive mental health treatment. Edson was not even formally diagnosed with depression and anxiety until 2020, decades after he began to have these feelings.

Although researchers believe there are many factors that can lead a victim of childhood sexual abuse to become involved in such abuse when they are adults, one literature review deeply researched several distinct factors.[11] This study found that male childhood sexual assault victims were more likely to become offenders in some form if any of the following were true: if they were abused when they were 12 years or older, if they were subjected to frequent sexual abuse, if they were subjected to serious sexual abuse, and if they had been abused by someone with whom they

---

[9] Shelly McGrath, Ashlyn Abbott Nilsen, Kent Kerley, *Sexual victimization in childhood and the propensity for juvenile delinquency and adult criminal behavior: A systematic review*, 16 AGGRESSION AND VIOLENT BEHAVIOR 485, 486 (2011).

[10] Malory Plummer and Annie Cossins, *The Cycle of Abuse: When Victims Become Offenders*, 19(3) TRAUMA VIOLENCE AND ABUSE 286, 299 (2018).

[11] Supra, Footnote 10, at 299.

have a familial relationship or one of dependency.[12]  Each of these factors are present for Edson. This coupled with the lack of therapy did not allow Edson to fully work through these issues and likely played a serious part in his role in this offense.

Years of abuse take an immense toll on one's mental health and impedes growth into a well-functioning adult. Studies show that maltreatment that occurs over a prolonged period has been linked to worse outcomes and mental health than isolated incidents of maltreatment.[13] Courts have often considered childhood abuse when deciding to grant a lesser sentence, and Edson's past abuse should be considered in this case as well.[14]

### Nature and Circumstances of the Offense

Edson struggled deeply to make connections with other kids and young adults as he was growing up. He was a victim of bullying, emotional and mental abuse, as well as sexual abuse. For Edson, the real world was frightening and cruel. The internet started gaining popularity as Edson was hitting his early teen years. It became his safe place, a place where he could be himself, chat with others, and not have to worry about them immediately writing him off because of his physical appearance. Edson was introduced to online pornography by his cousin when he was 12 years old. This quickly spiraled into a pornography addiction. Eventually, Edson cut off almost all live interaction with other people for internet connections.

---

[12] *Id.*

[13] Louise S. Ethier, Jean-Pascal Lemelin, & Carl Lacharite, *A Longitudinal Study of the Effects of Chronic Maltreatment on Children's Behavioral and Emotional Problems*. CHILD ABUSE & NEGLECT, July 8, 2004 at 1265-1278; Melissa Jonson-Reid, Patricia Kohl, & Brett Drake, *Child and Adult Outcomes of Chronic Child Maltreatment*, PEDIATRICS, April 2005, at 839-845.

[14] See *United States v. Deegan*, 605 F.3d 625 (8th Cir. 2010) (In explaining why it chose a lesser sentence, the court acknowledged that Deegan's life had not been "easy" and that it had been plagued with physical and sexual abuse.); *United States v. Walter*, 256 F.3d 891 (9th Cir. 2001) (the combination of beatings by defendant's father, and, most seriously, the sexual abuse defendant faced at the hands of his cousin justified the sentencing court's consideration of the psychological effects of childhood abuse); *United States v. Ayers*, 971 F.Supp. 1197 (N.D. Ill. 1997) (departure granted based upon cruel childhood with relentless physical, sexual and psychological abuse over course of years).

As the Court is aware, the things one can find on the internet can be incredibly disturbing, especially for young people with impressionable minds. He turned to online platforms like gaming, online dating, and pornography related sites to fill his social, romantic, and sexual needs. These platforms often devolve into places for people to chat in ways they would not in real life, saying things that they do not really mean and would never say face to face. Fantasy chatting is a popular pastime on these sites, and Edson got swept up in this type of perverted discourse. However, by the time Edson had fully immersed himself in online culture, he had still failed to learn how to develop healthy relationships. Part of this was due to his stunted emotional state, maturity, and childhood sexual abuse.

Trauma and other adverse childhood experiences affect the structure and chemistry of the brain and can stunt its natural growth and maturation.[15] These negative experiences have an effect not only in childhood, but throughout life.[16] Edson has faced traumatic experiences since he was four years old. During his childhood when he was meant to be developing healthy relationships and coping mechanisms, he was in a near constant state of fear – fear of dying, fear of bullying and abuse, fear of his worsening medical condition.

Living in this state for a significant period of time can have lifelong effects, specifically on emotional and mental development.[17] Edson failed to follow the normal path of mental maturation because of his childhood experiences. He became emotionally stunted in that time where he was experiencing distress on a near daily basis, and he was so isolated from his peers that he turned to an online community.

---

[15] Julia I. Herzog and Christian Schmahl, *Adverse Childhood Experiences and the Consequences on Neurobiological, Psychosocial, and Somatic Conditions Across the Lifespan*, 9 Front Psychiatry 420 (2018).
[16] Vincent J Felitti, *The Relation Between Adverse Childhood Experiences and Adult Health: Turning Gold into Lead*, 6(1) Perm J. 44–47 (2002).
[17] Supra note 16

By resorting to online communication, Edson's physical appearance and underdeveloped psychosocial skills were not immediately obvious to others. Edson knows the relationship he developed with L.H. online was wrong and inappropriate. At the time, Edson was used to getting immediately shot down when he expressed interest in someone. He got far too wrapped up in the idea of finally finding someone who reciprocated those feelings, and he made numerous horrible decisions. His lack of maturity and choice to ignore all the things wrong with this relationship are what brought him into this situation. Looking back, Edson regrets his choices and knows the relationship he formed with L.H. was wrong from the beginning.

Edson desperately wanted a relationship and to be loved. But unfortunately, his lack of maturity and emotional development coupled with his previous abuse led him to build an unhealthy relationship with a minor. His chats and interactions with the victim in this case had been shaped by his own previous abuse and the sexual "education" he received through the perverted domain of the internet. Edson just asks this Court to recognize the underlying problems he was facing at the time that caused him to act in this way.

### The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Provide Punishment and Deterrence, Balanced Against the Need for Rehabilitation.

In *United States v. Booker*, the Supreme Court's ruling made the Guidelines "effectively advisory." 125 S.Ct. 738, 757 (2005).. As a result of the Supreme Court's more recent sentencing pronouncements in *Gall v. United States*, 128 S.Ct. 586 (2007) and *Kimbrough v. United States*, 128 S.Ct. 558 (2007), the sentencing options available to district court judges have "significantly broadened." *Gall*, 128 S.Ct. at 602. District courts are free from any requirement that they mechanically adhere to the tight strictures of the guidelines, nor are courts required to even presume that the guidelines provide an appropriate sentence in each case.

Recognizing that the guidelines are simply the "starting point" in a sentencing analysis, district courts must delve deeper, and make an "individualized assessment based on the facts presented." *Gall*, 128 S.Ct. at 597. The sentencing court is "free to conclude that the applicable guideline range gives too much or too little weight to one or more factors, either as applied in a particular case or as a matter of policy." *United States v. Campos-Maldanado*, 531 F.3d. 337 (5th Cir. 2008). In this case, Edson will be pleading guilty to Traveling with Intent to Engage in Illicit Sexual Conduct with a Minor, a crime that does not have a mandatory minimum. Logically it follows that Congress accepted the possibility that some defendants charged with said offense would receive a community-based sentence.

There are several consequences to this plea that make a sentence of incarceration unnecessary and demonstrate punishment and deterrence. Edson will be a convicted felon, and that conviction comes with the lifelong stigma of being a "sex offender." The lifetime label sex offender has added consequence. It is very difficult to find work as a convicted felon and even harder for sex offenders. Based on Edson's medical condition, working from home or over the internet are probably his only options, but this type of employment may not be viable in light of his offense.

Sex offender registration also serves as a deterrent and, in many ways, a punishment. Sex offenders are marked permanently. Where they live and work are on public maps that can be found online. If it becomes known that a sex offender lives in the area, there is an increased risk of harassment from neighbors. No one wants a sex offender in their neighborhood. Even though a person's "debt" to society is paid after confinement, the public shaming will continue.

Registration comes with strict rules to promote deterrence and protect the public. Edson will be subject to these rules and restrictions. While these laws perhaps promote some public good, it is Edson that must live with the rules hanging over his head, reminding him of his shame.

Supervised release also serves as punishment and deterrence. The supervision is strict, and the officers monitor and ensure compliance. There are several resources and tactics that will be employed to make sure Edson follows the law and conditions of supervision. No computer or monitored computer access, no contact with minors, restrictions of activities, regular polygraphs, and indefinite sex offender treatment are all staples of supervised release. Edson will receive these conditions, which help meet the sentencing objectives. Supervised release for sex offenders is the most rigorous form of supervision in the country. These hurdles should help offset the need for incarceration.

Counsel once heard federal sentencing described by a district court judge as "threat assessment." The Court must ensure the defendant is no longer a threat to the public. Given these considerations and Edson's commitment to change, it is unlikely he will ever be before this Court or any court ever again. Edson respectfully requests the Court consider that when determining a sentence.

### The BOP cannot provide the most effective treatment for Edson

Looking forward, Edson will require monthly blood draws and daily medications for the remainder of his life. He will also need annual scans of his brain and heart to monitor his aneurysm and artificial valve. He will likely require at least one more heart valve replacement in the near future because his heart valve is artificial and was put in place when he was 18 years old. His other valves have shown some worsening and may also require replacement or repair.

Edson's right eye has already been removed and replaced with a prosthetic. Frequent surgeries throughout his life attempting to repair his right eye were necessary for chances of improvement but carried a risk of total blindness. Now, Edson's left eye is exhibiting the same progression. His doctors are hesitant to do surgery on his left eye in fear that he may go completely

11

blind immediately. The alternative is that his vision continues to deteriorate over time, and he will eventually go blind. Doctors have referred him to the Lighthouse for the Blind so that he can learn to use a blind cane and blindness coping techniques. Optimal medical treatment and care can slow the progression of Edson's MFS, but as with most MFS patients, his life expectancy is significantly lower.

Edson's physical condition is equivalent to that of an elderly person. If he were sentenced to the BOP, he would need multiple accommodations and would need to use the medical facilities and visit doctors far more often than other inmates. Not only is the BOP not equipped to handle Edson's medical needs, but attempting to do so would cost the BOP a significant amount of money.

The sentence imposed must ensure that "needed . . . medical care" is provided "in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). The Commission now recognizes that "[p]hysical condition . . . may be relevant in determining whether a departure is warranted," and has always recognized that "in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." USSG § 5H1.4.

Due to his condition, Edson has a lengthy list of medical needs – needs that the BOP will have to meet for him to get adequate care. In 2008, an audit by the Office of the Inspector General found systemic deficiencies in the Bureau of Prisons' delivery of health services.[18] It found that at several institutions, the Bureau of Prisons "did not provide required medical services to inmates," including inadequate treatment for chronic conditions, failure to properly monitor side effects of medication, allowing unqualified providers to render medical services, and failure to meet performance target levels on treatment of serious conditions. In 2010, a follow-up report was

---

[18] See U.S. Dep't of Justice, Office of the Inspector General Audit Division, The Federal Bureau of Prison's Efforts to Manage Inmate Health Care ii-xix, 32-34 (2008), available at https://oig.justice.gov/sites/default/files/legacy/reports/BOP/a0808/final.pdf

12

published which detailed some of the progress the BOP had made in trying to ensure providers met all the current standards.[19] However, the report points out several of the areas discussed in the 2008 report that still needed work.[20] This is the latest report by the Office of the Inspector General on this issue.

In May 2015, the Office of the Inspector General issued a report detailing the problems the BOP faces focusing on the aging prisoner population and their medical needs.[21] Although the focus was age, the medical issues these inmates face were also a focal point of the report. One issue this report describes is appropriate staffing levels. The BOP lacks the number of staff needed to properly address the needs of an inmate population with medical issues, and the training provided to the staff for this purpose is limited. The report points to the physical infrastructure of BOP institutions as another problem. The buildings cannot adequately house those with severe medical issues. These inmates often require specialized or handicapped-accessible cells, but overcrowding throughout the BOP system limits these types of living spaces. Inmates with limited mobility, like Edson, also encounter difficulties navigating in situations without elevators and with narrow sidewalks or uneven terrain."

Seeing a doctor in a timely fashion has also been a problem in BOP facilities. Using BOP data from one institution, the Office of the Inspector General found that the average wait time for inmates to be seen by an outside medical specialist, like a cardiologist, to be 114 days. With the host of medical issues Edson deals with, being able to see a doctor when he needs to is vital to his

---

[19] See U.S. Dep't of Justice, Office of the Inspector General Audit Division, Follow-Up Audit of The Federal Bureau of Prison's Efforts to Manage Inmate Health Care (2010), available at https://oig.justice.gov/reports/BOP/a1030.pdf.
[20] Supra note 13
[21] See U.S. Justice Dept. Report (May 2015) *The Impact of An Aging Prisoner Population on the Bureau of Prisons*, Executive Summary; Found at https://oig.justice.gov/reports/2015/e1505.pdf

13

health. Additionally, Edson will need to see doctors far more often than other inmates to maintain his current health regimen, and this would put more of a strain on the BOP than the average inmate.

Home detention has been considered as an alternative for defendants with serious medical needs, and when dealing with a chronically ill inmate, their overall health is an extremely important consideration when determining a sentence.[22] Home Detention is also punishment. It is largely restrictive on one's liberty and can be highly effective in the determent of crime and amply retributive.[23]

Considering these reports and the intense health issues Edson faces, there is no reason to believe that the Bureau of Prisons can provide "the most effective" treatment for Edson with his conditions, and the Presentence Investigation Report provides no information about how the BOP could do so. Additionally, with all of Edson's health issues, he is at a greater risk of suffering complications from COVID-19, which is still a problem in prisons across the country.[24] These downfalls of the standard of care in the BOP will be life or death for Edson. Further imprisonment

---

[22] *United States v. Rausch* 570 F.Supp.2d 1295 (D.Colo. 2008) (where D convicted of possession of child porn. and guidelines 120 months, court orders sentence of 1 day jail and supervised release for life with home detention in part because of need for dialysis –"strongest sentence without putting his life at risk" and defendant's "extremely poor health and complexity of his needs for medical care override any value that further imprisonment may have." and "client's vulnerability to victimization in prison in an unnecessary and unacceptably high risk—notwithstanding BOP statement that it can keep defendant safe it is clear that "violence against inmates especially sex offenders does occur and that vulnerable inmates are at greater risk of violence than typical inmate populations." ); *Brown v. Plata* 131 S.Ct. 1910, 1928(2011) ("Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society.") *United States v. McFarlin* 535 F.3d 808 (8th Cir. 2008) (where D convicted of § 371 conspiracy to distribute drugs and guidelines call for 10 years, district court's sentence of probation and home detention for three years not unreasonable in view of defendant's poor health (multiple heart surgeries, etc.)) *United States v. Coughlin* 2008 WL 313099 (unpub.) (W.D. Ark. Feb. 1, 2008) (where defendant, who embezzled money and evaded taxes, had serious health problems sentence of probation with home detention for 27 months imposed in part because "Home detention and probation can be severe punishments"—"and Factor (a)(2) also instructs the Court to consider provision of medical care in "the most effective manner" and not only the availability of medical treatment.); *United States v. Long*, 977 F.2d 1264, 1278 (8th Cir. 1992) (allowing a departure under § 5H1.4 where the defendant's frail health left him "exceedingly vulnerable to possible victimization and resultant severe and possibly fatal injuries").
[23] *See Coughlin* 2008 WL 313099
[24] *See United States v. Stepaniuk*, 2021 U.S. Dist. LEXIS 125692, *3 (Defendant's medical condition and his vulnerability to COVID-19 warranted a lesser sentence).

14

without "the most effective" treatment will damage Edson's health and shorten his life.[25] A period of home detention with permission to attend medical appointments is by far the most effective way to treat Edson's medical needs while also punishing him.

One important but sometimes overlooked factor when determining whether a prison sentence is necessary for a defendant is their safety in the BOP. In general, people charged with offenses related to minors are more likely to be abused while in prison.[26] However, Edson is at an even greater risk.

Edson's weak stature, his worsening blindness, and awkward demeanor will create significant difficulties for him in the BOP. Based on his physical characteristics combined with the nature of his offense, he is likely more prone to being abused in prison and would struggle in a halfway house.

### Time on Pretrial Release

Edson has been receiving excellent mental health treatment while on pretrial release. Removing him from that environment now when he has made significant progress could quickly disrupt that progress. Courts have considered this as potential for a major setback in treatment when determining a proper sentence.[27]

---

[25] *United States. v. Jenkins*, 854 F.3d 181, 197 n. 2 (2d Cir. 2017) ("[W]e do know that, as a statistical matter, the life expectancy of an incarcerated person drops 2 years for each year of incarceration. See Evelyn J. Patterson, The Dose-Response of Time Served in Prison on Mortality: New York State, 1989-2003, 103 Am. J. of Pub. Health 523, 526 (2013)).

[26] *United States v. Kelly*, 868 F.Supp.2d 1202, 1204 (D.N.M.,2012) (in child porn case, judge granted downward departure because psychiatrist testified "prison would have destructive and devastating effects" on the defendant "and would not be rehabilitating." "Indeed, because of the distorted and bizarre hierarchy of prison culture, Kelly may be subject to serious danger in prison."); *United States v. Spring*, 108 Fed. App'x 116, 125 (4th Cir. 2004) (allowing a departure under § 5H1.4 on the basis of the defendant's "extreme vulnerability to prison abuse") *United States v. Lara*, 905 F.2d 599, 603 (2d Cir. 1990) (allowing a departure under U.S.S.G. § 5H1.4 where the defendant's "immature appearance and fragility" rendered him especially vulnerable to abuse in prison).

[27] *United States v. Stall* 581 F.3d 276 (6th Cir. 2009) (in child porn. case where Guidelines 57-65 months, court's sentence of 1 day in jail, 10 years supervised release, and one year house arrest, not unreasonable in part because of defendant's mental state, ongoing therapy, and unlikely chance of recidivism, and that imprisonment would interrupt course of treatment); *United v. Olhovsky* 562 F.3d 530 (3d Cir. 2009)(where defendant convicted of possession of porn., district court's below-guideline sentence of 72 months unreasonably high in part because the record did not

15

Edson has strong family support that will help him overcome these challenges. He lives with his parents and two brothers who have been there with him throughout pretrial release, ensuring he follows all directives. Family support is incredibly important for someone working towards getting their life back on track and help from family lowers the risk of recidivism.[28] Edson has been on pretrial release for nineteen months and has not incurred a single violation. His behavior on pretrial release is the perfect way to see how he will perform while on supervised release. Courts have previously considered this performance on pretrial release while at sentencing.[29]

## **Conclusion**

Edson's life has been extremely unique and tragic, and he knows he has made several terrible choices in his past. However, he is determined to rehabilitate himself and not to let his previous misconduct define his future. The best way for Edson to do this is to continue receiving proper medical care and continue on a deeper mental health journey in the community.

Prison time is not the only unit by which justice can be measured. This is a rare case where a custodial sentence would likely produce a worse result. Home incarceration with the ability to

---

reflect the reasons for the court's " believing that treatment in prison would "provide . . .correctional treatment in the most effective manner" [as required by 18 U.S.C. § 3553(a)(2)(D)] despite [treating psychologist's] opinion to the contrary" and that in prison defendant would "regress."); *United States v. Autery* 555 F.3d 864 (9th Cir. 2009)(where defendant convicted of poss. of porn. and where guidelines 41-51 months, court's sua sponte variance to probation not unreasonable in part because of district court's determination that incarceration "would undermine" defendant's rehabilitation and that "probation with psychiatric treatment was a more appropriate sentence" than incarceration); *United States v Polito*, (5th Cir. Jan. 31, 2007) 2007 WL 313463 (unpub.) (where defendant convicted of possession of child pornography, district court's sentence of probation with one year house arrest reasonable in part because "a term of imprisonment would interrupt Polito's mental health treatment").

[28] See Shirley R. Klein et al., Inmate Family Functioning, 46 INT'L J. OFFENDER THERAPY & COMP. CRIMINOLOGY 95, 99-100 (2002) ("The relationship between family ties and lower recidivism has been consistent across study populations, different periods, and different methodological procedures."); Phyllis J. Newton, Jill Glazer, & Kevin Blackwell, Gender, Individuality and the Federal Sentencing Guidelines, 8 FED. SENT'G REP. 148 (1995) ("[T]he better family ties are maintained[,] the lower the recidivism rate,").

[29] *See United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (below guidelines sentence affirmed in part due to defendant's behavior while on a year-and-a-half pretrial release, which the district court found to be commendable, showing defendant is unlikely to reoffend); *United States v. Baker*, 502 F.3d 465 (6th Cir. 2007) (below guideline sentence of probation with one year house arrest proper in part because he behaved "exceedingly well" while under supervision of pretrial services).

attend medical appointments will provide significant punishment for Edson. He will be a convicted felon and registered sex offender forever. He will also have to follow the strict conditions of supervised release. This sentence will adequately punish and deter while balancing the potential for rehabilitation and accommodating Edson's worsening medical situation.

WHEREFORE, for the foregoing reasons, Edson Ortiz respectfully requests the Court sentence him to eight days' time served, a period of home incarceration with the ability to attend medical appointments followed by lifetime supervised release.

Respectfully submitted,

FRANK, JUENGEL & RADEFELD,
ATTORNEYS AT LAW, P.C.


By  */s/ Daniel A. Juengel*
    DANIEL A. JUENGEL (#42784MO)
    Attorney for Defendant
    7710 Carondelet Avenue, Suite 350
    Clayton, Missouri 63105
    (314) 725-7777

**CERTIFICATE OF SERVICE**

I hereby certify that on January 17, 2023, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following.

Jillian Anderson
Asst. United States Attorney
111 South Tenth Street, 20th Floor
St. Louis, Missouri, 63102

                                           */s/ Daniel A. Juengel*
                                           DANIEL A. JUENGEL